## Richmond

### S. MASON CARBAUGH, COMMISSIONER OF AGRICULTURE AND CONSUMER SERVICES, ET AL.

### V.

### CHRISTINE SOLEM

April 29, 1983.

Record No. 802031.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and Harrison, Retired Justice.

John Purcell, Jr., Assistant Attorney General (Marshall Coleman, Attorney General; R. Leonard Vance, Assistant Attorney General, on brief), for appellants.
Francis Chester for appellee.

POFF, J., delivered the opinion of the Court.

In this appeal, we must decide whether Christine Solem (respondent) violated a state regulation prohibiting the sale of unpasteurized milk and, if so, whether the trial court erred in denying a prohibitory injunction sought by S. Mason Carbaugh, Commissioner of the Department of Agriculture and Consumer Services, and James B. Kenley, M.D., State Health Commissioner (collectively, complainants). Other issues complainants argue on appeal are beyond the purview of the questions formally presented in their brief.*

In 1970, the Department exercised its authority under Code §§ 3.1-530.1, *et seq.*, to promulgate "Rules and Regulations Governing the Production, Processing and Sale of Grade 'A' Pasteurized Market Milk and Grade 'A' Pasteurized Market Milk Products and Certain Milk Products." In June 1980, complainants filed a bill charging respondent with violation of three of those regulations, including Regulation X, which prohibits the sale of raw milk and raw milk products. Pursuant to Code § 3.1-530.8, complainants prayed for an injunction restraining further violations. The trial court issued a temporary injunction, and the cause was set for trial.

The transcript reveals no material conflict in the evidence. In 1974, respondent began raising goats on Satyrfield, a 10-acre farm in Albemarle County. She testified that, for four years, she "had been selling milk in the Blue Mountain Health Food Store,

---

* Constitutional issues respondent argues on brief were never raised by assignments of cross-error and, hence, will not be noticed by this Court. Rule 5:27.

marking it not for human consumption, because [she] believed that that was legal." "I was stopped from doing that in November of 1979," she said, "and I wanted to try and figure out a legal way to provide people with unpasteurized milk when they wanted it. . . ."

Upon her own initiative, respondent devised a "lease-a-goat pro-gram". To promote the endeavor, she "had business cards drawn up" and displayed them in several health food stores. She also placed advertisements in a bi-monthly publication and "on the ra-dio." Under the program as she explained it at trial, her "custom-ers" were required "to phone ahead and reserve the goat, at least two days in advance". The next day, respondent and a "helper" milked the rented goats and stored the milk under refrigeration. When the "lessee" arrived, he was asked to sign a written "lease", respondent poured the milk into the lessee's container, and the lessee paid a rental fee of $3.00 per day for each goat. For this fee, the lessee was entitled to receive all the "by-products" pro-duced by the designated goat in a 24-hour period and to use the goat as a family pet. Under the terms of the lease, however, the "rental goat is not to leave the premises of Satyrfield". Respon-dent acknowledged that she had continued to conduct the leasing program "[a]fter the temporary injunction" was entered but that she "did mark [the containers] for animal use."

Respondent introduced several witnesses who testified that the milk they acquired under their leases was essential as a substitute for cow's milk to which their children were allergic. Some fed the goat's milk to animals. Other lessees used the goat's manure as fertilizer. Complainants were prepared to submit affidavits exe-cuted by medical experts attesting to a causal connection between consumption of raw milk and a variety of contagious infections.

The trial judge expressed an opinion from the bench that "in seeking an injunction it seems to me the Court has to deal with it in the light of whether or not it amounts to such a problem that irreparable harm will come about, that it constitutes a threat of some kind to the public health and safety." The court had "grave difficulty in perceiving such a threat" in what he characterized as a "very limited, very restricted arrangement," and found no "need for the state to take this action". Ruling that respondent "has not placed her goods or products in commerce" and being "unwilling to say that the customer is to be protected from himself when he

knows what he is getting", the trial court denied the injunction and entered a final order dismissing the complaint.

We consider first whether respondent's transactions constituted violations of departmental regulations. Those regulations, promulgated as they were pursuant to definitive statutory authority, have the force and effect of law. Regulation X proscribes the sale of unpasteurized milk. Such sales are commerce, and all such commerce, no matter how "limited" or "restricted", is unlawful. A single sale is both a civil violation and a criminal offense. "Any violation of . . . the regulations . . . shall be a misdemeanor and . . . [e]ach day of such . . . violation shall be a separate offense". Code § 3.1-530.9.

Respondent contends that her "lease-a-goat program" does not violate the regulation because it does not involve a sale. Citing Code § 8.2-106, which provides that "[a] *sale* consists in the passing of title from the seller to the buyer for a price (§ 8.2-401)", respondent argues that she "retains title to the goat but gives up her right to use any by-product that the goat produces on a day the goat is leased."

Respondent's argument, which focuses upon the goat, skews the issue. The regulation does not proscribe sale of the animal. The violation with which respondent was charged was a sale of the raw milk produced by the animal. It is immaterial that title to the goat never passed; title to the milk passed when respondent completed the act of delivery. "[T]itle to goods passes . . . in any manner and on any conditions explicitly agreed on by the parties [and] . . . at the time and place at which the seller completes his performance with reference to the physical delivery of the goods". Code § 8.2-401(1) and (2).

Since at least a portion of the price paid, *i.e.,* the "rental fee," was ascribable to the value of the milk acquired, the transaction satisfied the statutory definition of a sale. We hold, therefore, that respondent violated the proscription of Regulation X.

We now consider whether the trial judge erred in denying an injunction restraining further violations. As complainants point out, the judge "interposed common law equitable principles" as the basis of his ruling. In traditional chancery practice, lack of proof of irreparable harm is generally fatal. A court of equity will not issue an injunction, an extaordinary remedy, if the petitioner has an adequate remedy at law for the redress of his injury.

But complainants did not seek an injunction on traditional equitable grounds. Rather, they invoked the provisions of Code § 3.1-530.8:

> In the event of violation of any provision of this article or the regulations adopted thereunder, either commissioner may petition any appropriate court of record for relief by injunction, without being compelled to allege or prove that an adequate remedy at law does not exist.

When the General Assembly determines that certain conduct is inimical to the public interest, a petition for an injunction "need not contain an allegation of 'irreparable injury'." *WTAR Radio-TV* v. *Virginia Beach,* 216 Va. 892, 894, 223 S.E.2d 895, 897 (1976). Here, the General Assembly has *expressly* mooted the irreparable-injury inquiry. Complainants were not required to negate the existence of an adequate remedy at law. The only proof mandated by the statute was proof of respondent's violation of the regulations.

We hold, therefore, that the trial court erred in dismissing the bill of complaint, and we will reverse the judgment and remand the cause with instructions to issue an injunction against respondent in accord with the views expressed in this opinion.

*Reversed and remanded.*